# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANLEY L. MCDANIEL, | ) CV F 04 6596 DLB |
| | ) |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| JO ANNE B. BARNHART, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| ) |

## BACKGROUND

Plaintiff Stanley L. McDaniel ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On March 11, 2005, the Honorable Anthony W. Ishii reassigned the case to the undersigned for all purposes.

### FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for SSI on November 13, 2000, alleging disability since January 1, 1991, due to back problems, lung problems, loss of a finger, numbness on the right side, and memory loss. AR 71-73, 74-83. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 54-58, 61-65, 66. On July 10, 2003, ALJ James Berry held a hearing. AR 410-430. On October 28, 2003, ALJ Berry found that Plaintiff was not disabled. AR 12-23. On September 19, 2004, the Appeals Council denied review. AR 4-6.

Hearing Testimony

ALJ Berry held a hearing on July 10, 2003, in Fresno, California. Plaintiff appeared with his non-attorney representative, Weldon Reeves. Vocational expert ("VE") Jose Chaparro also appeared and testified. AR 410.

At the beginning of the hearing, the ALJ noted that Plaintiff was in a wheelchair and that his right arm appeared to have a tremor. AR 414. When asked if he could answer questions, Plaintiff replied, "Don't comprehend a lot," but indicated he would do his best. AR 414.

Plaintiff testified that he completed the eighth grade and went to trade school. AR 414-415. He was in the military for one year, from 1969 to 1970. AR 415. He last worked in 1991 as a welder. AR 415. He stopped working because of his back. AR 415.

Plaintiff indicated that he was in a wheelchair because of left side partial paralysis and that he could occasionally use a walker at home. AR 415. He has been using a wheelchair for a year and a half. AR 416. He lives with his sister, who is also disabled, and his nephew. AR 416, 418. A care giver comes in five days a week, for eight hours a day, and cooks, cleans and provides his care. AR 416-417. He has a physical therapy session every morning that lasts 15 to 30 minutes to improve his muscle tone and walking. AR 417. He receives speech therapy four times per week from the Veterans Administration ("VA"). AR 417.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff testified that he does not do any chores, does not cook and does not leave the house except for medical appointments.  AR 418.  His listens to the radio and has a difficult time focusing on the television.  AR 418.  He needs help getting in and out of bed and uses a slide board.  AR 418.  He can "barely" use his right hand for anything and always drops things.  AR 419.  He can't move his left arm from his shoulder or elbow.  AR 419.

He has been having problems with his memory since 2000 when he had a mini stroke.  AR 419.  He also has problems breathing, explaining, "50 percent lungs."  AR 419.  He uses albuterol twice a day.  AR 419.  He tried to stop smoking through group sessions at the VA, but his blood pressure "went sky high."  AR 420.

He has had seizures all his life and although he can't remember what happens when he has a seizure episode, he indicated that he blacks out and loses control of his bladder function.  AR 420.  He last had a seizure three months ago.  AR 420.

His care giver and sister assist him in taking his medications.  AR 421.  His medications make him drowsy and he sleeps 10-12 hours in a 24 hour period.  AR 421.  He spends most of his time lying down.  AR 421.  His seizure medications help and other medications relieve his pain and keep his blood pressure down.  AR 422.

When asked if he had any income, Plaintiff indicated that he could work if he could, and that he blamed the ALJ's 1996 ruling for his condition.  AR 422.

Plaintiff testified that he could stand for 15 minutes in an eight hour day and could walk less than 25 feet.  AR 422-423.  He could lift less than five pounds and carry about 10-15 pounds.  AR 423.  His back hurts when he sits and when asked how long he could sit, he responded, "chair cushion."  AR 424.

When questioned by his representative, Plaintiff explained that he lives with pain everyday.  AR 424.  The pain is in his chest, back, and joints and he also gets headaches.  AR 424.  On a scale of 1 to 10, his pain is a 10 at its worst and a 7 at its best.  AR 424-425.  The most comfortable position is lying down.  AR 425.

The ALJ asked the VE to assume an individual of Plaintiff's age, education and past relevant work, who could lift and carry 20 pounds occasionally and 10 pounds frequently, and

1   who could stand, walk and sit six hours each.  AR 428.  This person must avoid exposure to

2   unprotected heights, and dangerous, moving machinery, and could not operate motor vehicles.

3   AR 428.  This person could not perform Plaintiff's past relevant work, but could perform the

4   positions of cashier (15,600 in California and 141,700 nationally), ticket seller (11,700 in

5   California and 106,300 nationally) and semiautomatic sewing machine operator (800 in

6   California and 6,900 nationally).  AR 428.

7       For the second hypothetical, the ALJ asked the VE to assume that this individual could

8   stand 15 minutes maximum and walk less than 25 feet.  AR 429.  This person could lift five

9   pounds and carry five to ten pounds in a wheelchair.  This person could sit three hours total.

10  AR 429.  This person could not move or use the left upper extremity and must avoid exposure

11  to unprotected heights, dangerous, moving machinery, and operation of motorized vehicles.  AR

12  429.  This individual could not perform any of Plaintiff's past relevant work or any other jobs.

13  AR 40.  This finding would not change if the ALJ added an inability to tolerate pulmonary

14  irritants more than occasionally.  AR 430.

15      Medical Evidence

16          In November 2000, Plaintiff was treated at the emergency room for chest and right arm

17  pain.  AR 135-155.  A chest x-ray revealed granuloma at the left base and diffuse prominence to

18  the pulmonary interstitium which was difficult to evaluate due to poor inspiratory effort.  AR

19  140.  Mild congestive changes could not be ruled out.  AR 140.  A CT scan of the brain was

20  normal and tests were negative for a heart attack.  AR 139, 142.

21      On February 19, 2001, Plaintiff saw Thomas F. Mullady, M.D., for a consultive internal

22  medicine evaluation.  Plaintiff complained of low back pain since 1991, when he fell into a

23  hole, and shortness of breath since 1956, when a gas tank exploded and he suffered "fire

24  damage" to his lungs.  He explained that he sustained a crush injury to his left thumb in 1980

25  and underwent surgery, but has no sensation in his thumb or index finger and loss of sensation

26  over the entire left arm.  He also complained of impaired short term memory.  AR 156-159.

27      Upon examination, Plaintiff had a moderate decrease in breath sound intensity

28  bilaterally and a decreased range of motion of the lumbar spine.  AR 158.  There was ankylosis

of the terminal left thumb joint.  Gait and muscle strength were normal.  Grip and dexterity

were mildly impaired in the left hand.  There was a moderate decrease in sensation over the

entire surface of the left arm.  AR 158.  Plaintiff made adequate effort in the performance of

pulmonary function testing, which showed no improvement following bronchodilator

inhalation.  AR 158.  Dr. Mullady diagnosed low back pain, by allegation, chronic obstructive

pulmonary disease, and decreased visual acuity.  Dr. Mullady explained that although Plaintiff

complained of low back pain and had a marked decrease in range of motion in the lumbar spine,

x-rays revealed only mild osteoarthritic changes.  AR 159, 160.  Dr. Mullady opined that

Plaintiff could perform at least light to moderate physical activities not involving heavy lifting

or repetitive bending.  AR 159.

In March 2001, a State Agency physician assessed Plaintiff's vision impairment and

opined that Plaintiff was limited in near and far acuity.  AR 166-173.

In May 2001, Plaintiff began receiving treatment from the VA.  AR 245.  He reported a

history of pectus excavatum and emphysema, but indicated that he was a smoker most of his

life.  He also reported a history of two strokes in January 2000 and November 2000, with

resulting left side numbness and weakness.  He reported a history of bipolar disorder with no

treatment since 1998.  AR 245.  He was prescribed inhalers and referred to specialty clinics.

AR 246.

A June 7, 2001, chest x-ray revealed interstitial lung infiltrates bilaterally.  AR 230.  A

CT scan was performed in July 2001 that showed diffuse ground-glass opacification of the lung

fields and a five millimeter granuloma was seen in the left upper lobe.  AR 228.  Band scarring

and/or atelectasis was seen in both lung bases.  AR 228.

Plaintiff underwent pulmonary function testing on June 15, 2001.  He gave fair effort.

There was mild restriction with no airflow obstruction.  AR 241.

On July 21, 2001, Plaintiff underwent a psychological evaluation by Lance A. Portnoff,

Pd.D.  Plaintiff reported that he was in special education classes/speech therapy throughout

elementary school and high school due to a learning disorder and that he had a history of

ADHD.  He reported that he completed the 12th grade.  Plaintiff indicated that he had two

5

cerebral strokes in January and November 2000 and has resulting numbness in his left leg, left

arm and left side of his face.  He also complained of headaches and memory problems and

indicated that received treatment for bipolar disorder.  Upon examination, Plaintiff presented

with left hemiparesis in the arm and face.  His left arm hung limp most of the time, but he

could use it a little bit when asked.  Dr. Portnoff diagnosed mild bipolar disorder, mild panic

disorder with agorophobia, cognitive disorder with multiple etiologies, and borderline

intellectual functioning.  His GAF score was 45.  He opined that Plaintiff had mild-to-moderate

restrictions in daily activities, moderate limitations in maintaining social functioning and in his

ability to respond appropriately to co-workers, supervisors or the public, and mild difficulties

with concentration, persistence and pace, and in his ability to respond appropriately to usual or

routine work situations.  Plaintiff could understand, carry out and remember simple instructions.

AR 174-179.

In September 2001, State Agency physician Sadda Reddy, M.D., completed a Physical

Residual Functional Capacity Assessment form.  Dr. Reddy opined that Plaintiff could

occasionally lift/carry 20 pounds, 10 pounds frequently, stand and/or walk about six hours in

and eight hour day, and sit about six hours in an eight hour day.  He could occasionally climb,

stoop and crouch and could frequently balance, kneel and crawl.  He would have difficulty with

discrimination of small objects at a distance and had to avoid concentrated exposure to fumes,

odors, dusts, gases, poor ventilation, etc.  AR 180-187.

Also in September 2001, State Agency physician Glenn Ikawa, M.D., completed a

Mental Residual Functional Capacity Assessment form and opined that Plaintiff would be

moderately limited in his ability to understand, remember and carry out detailed instructions.

Plaintiff would also be moderately limited in his ability to interact with the general public and

co-workers.  He could perform simple, repetitive tasks over two hour intervals.  He was capable

of limited interactions with supervisor, co-workers and the public and was capable of adapting

to normal work situations.  AR 198-200.

On January 18, 2002, Plaintiff saw Syed F. Naqvi, M.D., at the VA.  He complained of increased left sided weakness and numbness.  He used a cane in his right hand.  He reported seizure episodes and was prescribed Dilantin and advised to stop smoking.  AR 330.

Plaintiff saw Dr. Naqvi on February 1, 2002.  Plaintiff indicated that Dilantin was controlling his seizures but caused excessive drowsiness.  Dr. Naqvi decreased Plaintiff's Dilantin and advised him to stop smoking.  AR 319.

On February 8, 2002, Plaintiff underwent a CT scan of the head, which revealed no evidence of acute intracranial pathology.  AR 318.

Plaintiff was referred to physical therapy for evaluation of the effects of his strokes.  AR 324-325.    On February 22, 2002, physical therapist Daniel Snider evaluated Plaintiff and opined that Plaintiff was not safe to ambulate by himself due to his decreased strength on the left side of his body.  He indicated that he would order Plaintiff a wheelchair, tub transfer bench and a jay care cushion.  AR 325.

On February 27, 2002, Mr. Snider opined that Plaintiff's clinical manifestations were not consistent with a stroke.  AR 314.  Plaintiff continued with his physical therapy until April 2002.  AR 298.

On March 4, 2002, Plaintiff sought mental health treatment from the VA.  He requested medication for his depression, which he reported had worsened because of three strokes in the past 18 months.  Plaintiff presented in a wheelchair and was able to wheel himself around.  His upper arms had adequate tone, but when he wasn't wheeling himself around, his held his right arm in such a way that it seemed to be paralyzed.  Doris Tan, D.O., diagnosed depression, not otherwise specified and bipolar disorder by history.  She recommended further evaluation.  AR 312.

In March 2002, State Agency physician James V. Glaser, M.D., completed a Physical Mental Functional Capacity Assessment.  He opined that Plaintiff could occasionally lift/carry 20 pounds, 10 pounds frequently, stand and/or walk about six hours in and eight hour day, and sit about six hours in an eight hour day.  He could occasionally climb, stoop and crouch and could frequently balance, kneel and crawl.  He was limited in fingering and handling with the

1    left hand had to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.

2    and hazards (machinery, heights, etc.)  AR 252-259.

3          Also in March 2002, State Agency physician Evangeline Murillo, M.D., completed a

4    Mental Residual Functional Capacity Assessment form and opined that Plaintiff would be

5    moderately limited in his ability to understand, remember and carry out detailed instructions.

6    Plaintiff would also be moderately limited in his ability to interact with the general public and

7    co-workers.  He could perform simple, repetitive tasks over two hour intervals.  He was able to

8    react to work change, but should have limited contact with the public.  AR 260-262.

9          A CT scan of the head in March revealed no significant abnormalities.  AR 310.

10          In April 2002, Plaintiff saw Dr. Tan at the VA.  He was in a wheelchair and indicated he

11    would "end it all" if his SSI application was denied.  After discussing his psychiatric history

12    and examining him, Dr. Tan diagnosed mood disorder,  not otherwise specified, and bipolar

13    disorder by history.  AR 299.  Plaintiff indicated that Prozac was helping his moods and did not

14    cause any side effects.  AR 299.

15          Also in April, 2002, Plaintiff saw Dr. Naqvi.  He did not report any side effects from his

16    medications.  Upon examination, he had left sided weakness and diminished strength.  AR 302.

17          On May 7, 2002, Plaintiff saw Nurse Practitioner Alexandra McGrady at the VA for

18    evaluation of his seizure disorder.  AR 292.  Plaintiff reported that he has had grand mal

19    seizures since childhood, and last had one in March 2002.  Nurse McGrady observed that when

20    Plaintiff was called from the waiting room he used both arms to wheel the wheelchair, but his

21    left arm assumed a hemiplegic position when the exam began.  AR 292.  He was able to

22    independently move from the wheelchair to the examination table.  Nurse McGrady discussed

23    the case with Dr. Mehta and noted that it was interesting that Plaintiff could get into the service

24    with his alleged seizure disorder.  AR 292.  She diagnosed psychogenic weakness, with no

25    evidence of hyperreflexia or atrophy to support a stroke.  AR 292.  She advised Plaintiff to stop

26    smoking and requested further testing.  AR 292.

27          On May 10, 2002, Plaintiff returned to Dr. Tan and requested an increase in his Prozac

28    dose.  He was in a wheelchair and reported that he had been using it since March.  No atrophy

or diminished tone was noted in his lower legs or upper arms.  Dr. Tan noted that his sandals were dirty.  AR 291.  She diagnosed bipolar disorder and "rule out malingering vs. somatization disorder vs. conversation disorder."  AR 291.

An EEG performed in May 2002 was normal.  AR 297.

Plaintiff was seen at the VA in June 2002 and complained of shortness of breath.  AR 281.  Plaintiff presented in a wheelchair and was stuttering.  He had restricted lung capacity but no evidence of airflow obstruction.  His oxygen saturation was 92 percent.  He still smoked two packs per day and was instructed to stop.  AR 282.

In June 2002, Dr. Tan reviewed Plaintiff's prior mental health records and learned he had been diagnosed with depression and polysubstance dependence, but not bipolar disorder.  She noted "continued inconsistencies" in Plaintiff's presentation and speech patterns.  She also encouraged Plaintiff to focus on getting better rather than relying on his SSI claim, which he was "quite passionate about."  AR 408.

Plaintiff saw Dr. Tan in July 2002.  He was in a wheelchair and explained that he had hemiparesis from several right sided strokes.  He had good tone of his left upper extremities but assumed a paralyzed position when he spoke.  He leaned against his left side, even though that was the side of his weakness.  He was able to use both hands to wheel his wheelchair.  AR 406.

Plaintiff's medication was changed to Phenobarbital in August 2002.  AR 395.

In February 2003, Plaintiff underwent a sleep-deprived EEG study.  Although the test was not optimal, the results were normal.  AR 360.

Plaintiff's caretaker called the VA to report and describe grand mal seizures in February and April 2003.  AR 370, 373.  During the February conversation, the caretaker was advised to have Plaintiff taken by ambulance to the emergency room, but she asked if she could watch him at home.  AR 373.

Plaintiff saw Dr. Naqvi on May 5, 2003.  Dr. Naqvi completed a General Assistance Employability Examination Report and indicated that Plaintiff was permanently incapacitated from any type of work.  AR 409.

On May 13, 2003, Plaintiff saw Dr. Mehta at the VA.  He presented with his care giver and reported that he had a seizure in April.  On examination, Plaintiff was stuttering and had tremors of the arms.  His left leg was weak from past strokes and he tended to fall on his left side.  Dr. Mehta diagnosed seizure disorder, secondary to stroke, causing left hemiparesis, and indicated that Plaintiff was unable to take care of himself and needed home care help.  Plaintiff was still smoking 30 cigarettes per day.  AR 351.

On May 22, 2003, Plaintiff went to the VA complaining of left sided pain that radiated to his left shoulder and neck.  He thought he was having another stroke.  Dr. Holden noted that Plaintiff's story changed again when he complained of pain in the diaphragm and a cough.  A CT scan of the head was normal.  AR 346.  Plaintiff eventually left because he did not want to wait.  AR 348.

In August 2003, Plaintiff's anti-depressant medication was changed because it interfered with the Phenobarbital.  AR 337.

ALJ's Findings

_____Prior to reviewing the current application, the ALJ explained that Plaintiff had filed a prior application for period of disability and disability insurance benefits, which was denied by an ALJ on November 20, 1997.  AR 15.  This prior decision was administratively final.  The ALJ found, however, that Plaintiff rebutted the presumption of continuing nondisability by introducing evidence of new impairments that were not considered in the prior decision.  AR 16.

The ALJ determined that Plaintiff had the severe impairment of a history of seizure disorder, but retained the residual functional capacity ("RFC") for light work with restrictions in exposure to heights, moving machinery and operating motor vehicles.  AR 16.  The ALJ doubted Plaintiff's credibility based on discrepancies in the record.  AR 20-21.  Based on the testimony of the VE, the ALJ determined that Plaintiff could perform the jobs of ticket seller, semi-automatic sewing operator.  AR 22.

///

///

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

11

1   C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ

2   found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

3   disability; (2) has an impairment or a combination of impairments that is considered "severe"

4   (history of seizure disorder) based on the requirements in the Regulations (20 CFR §§

5   416.920(b)); (3) does not have an impairment or combination of impairments which meets or

6   equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot

7   perform his past relevant work; (5) but retains the RFC to perform a significant number of jobs

8   in the national economy.  AR 22-23.

9        Plaintiff argues that the ALJ (1) failed to fully develop the record; (2) improperly

10   rejected Plaintiff's testimony; (3) improperly rejected the treating physician's opinion; (4)

11   improperly rejected the opinions of the consultive examiners and medical consultants; (5)

12   overlooked significant relevant evidence in determining Plaintiff's RFC; (6) improperly ignored

13   lay witness testimony; and (7) improperly relied upon the VE testimony.

14                                 **DISCUSSION**

15   A.     Duty to Develop the Record

16        Plaintiff first argues that the ALJ failed to develop the record by failing to incorporate

17   the records from Plaintiff's prior application.  Plaintiff contends that these records would have

18   substantiated more recent evaluations and explained Plaintiff's contradictory statements.

19        While the ALJ has a duty to develop the record in certain circumstances, such

20   circumstances do not exist here.  Plaintiff's prior application was denied on November 20,

21   1997, and as the ALJ noted, became res judicata and administratively final for the period prior

22   to November 20, 1997.  *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1996).  In other words, the

23   prior ALJ's decision that Plaintiff was not disabled any time prior to November 20, 1997, was

24   final and the ALJ need not incorporate the evidence in support of the prior application even

25   though he found that Plaintiff rebutted the presumption of continuing nondisability.

26        Although Plaintiff contends that the prior evidence would have substantiated the medical

27   evidence and explained Plaintiff's discrepancies in his testimony, it does not change the fact

28

[3]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

1  that the period prior to November 20, 1997, was final.  In any event, the evidence before the

2  current ALJ was neither ambiguous nor inadequate to trigger the ALJ's duty to develop the

3  record.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001).  Indeed, as Respondent

4  points out, Plaintiff had ample opportunity to explain the inconsistencies the record.

5  B.    Plaintiff's Testimony

6        Next, Plaintiff argues that the ALJ erred by (1) improperly discrediting Plaintiff's

7  allegations regarding his pulmonary conditions and breathing problems based on his failure to

8  stop smoking; (2) improperly discrediting Plaintiff's testimony based on lack of evidence of a

9  prescription for a his wheelchair; (3) improperly using "sit and squirm jurisprudence;" and (4)

10 improperly discrediting Plaintiff's testimony based on medical notes describing the condition of

11 Plaintiff's attire.

12       The ALJ is required to make specific findings assessing the credibility of plaintiff's

13 subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  In

14 rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible

15 and what evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834

16 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584

17 (9th Cir. 1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony

18 as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility

19 determination with findings sufficiently specific to permit the court to conclude that the ALJ

20 did not arbitrarily discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th

21 Cir. 2002).

22       "The ALJ may consider at least the following factors when weighing the claimant's

23 credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's]

24 testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work

25 record, and testimony from physicians and third parties concerning the nature, severity, and

26 effect of the symptoms of which [claimant] complains."  *Id.* (citing *Light v. Soc. Sec. Admin.,*

27 119 F.3d 789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial

28 evidence in the record, we may not engage in second-guessing."  *Id.*

1    In his decision, the ALJ undertook a thorough and detailed analysis of Plaintiff's

2  credibility.  He noted that Plaintiff continued to smoke heavily, gave fair effort during a

3  pulmonary function test, gave inconsistent reports about being institutionalized and using street

4  drugs, stated that he was badly burned as a child but had no scarring, stated that he fell into a

5  hole in 1991 and herniated discs but x-rays were not supportive, and that his clinical

6  manifestations were not consistent with having a stroke.  AR 18-19.  The ALJ also noted that

7  Plaintiff was able to use both arms to wheel his wheelchair but held his left arm as if it was

8  paralyzed during examinations.  AR 19, 20.  The ALJ explained that Plaintiff was able to get

9  into the service despite his allegation of a seizure disorder since childhood.  AR 19.  He set

10  forth the notations in the medical evidence that Plaintiff's sandals were dirty and that there were

11  no signs of atrophy or diminished tone in the upper or lower extremities, and found these facts

12  to be inconsistent with Plaintiff's allegations.  AR 19.  The ALJ further explained that there was

13  no evidence in the record that a wheelchair had been prescribed.  AR 19.  The ALJ explained

14  that Plaintiff was able to answer the questions asked of him with appropriate and topic related

15  responses.  Finally, the ALJ examined Plaintiff's inconsistent statements regarding his

16  employment and educational history.  AR 21.  The Court will now turn to Plaintiff's specific

17  contentions.

18         a.    *Plaintiff's Failure to Stop Smoking*

19         The ALJ noted that Plaintiff's failure to stop smoking, despite being advised of the

20  importance of doing so, detracted from his credibility.  AR 18.  Specifically, the ALJ

21  determined

22         it can be inferred from his noncompliance to quit smoking that perhaps his shortness of
       breath was not as severe as he reported it to be, or that it had not become severe enough

23     to motivate him to make the necessary lifestyle changes that would reduce his symptoms
       and promote better health, or that he simply did not really wish his condition to improve

24     and felt he was benefitting in some way form characterizing himself as disabled.
       Whatever factor has given rise to his noncompliance, the fact he has consistently refused

25     to follow his physician's directions definitely detracts from his credibility.

26  AR 18.

27         Plaintiff argues that the ALJ did not provide substantial evidence that Plaintiff lacked

28  good cause for failing to follow prescribed treatment.  However, he misunderstands the ALJ's

14

1   use of the information.  The ALJ did not make these statements in the context of finding that

2   Plaintiff failed to follow prescribed treatment and should therefore be denied benefits on that

3   basis.  *See* 20 C.F.R. § 404.1530.  Instead, the ALJ used Plaintiff's noncompliance in evaluating

4   the overall nature of his disability and concluding that his resulting impairments were are not as

5   severe as he alleged.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is

6   entitled to draw inferences logically flowing from the evidence).

7          Plaintiff also contends that it was not clear from the medical records that his pulmonary

8   conditions could be remedied by stopping smoking.  This is certainly a difficult argument to

9   make with a straight face.  Regardless of whether his pulmonary condition or his other ailments

10  would benefit from cessation of smoking, the record contains numerous instances of Plaintiff's

11  physicians advising him to quit.  Indeed, one physician opined that Plaintiff needed to stop

12  smoking, as it was "a big risk factor for stroke."  AR 292.

13         Finally, Plaintiff points to his testimony that he tried to stop smoking through a group

14  program at the VA, but could not because his blood pressure went up.  AR 420.  He also

15  submits that his agoraphobia prevented him from participating in a group program.  His reasons

16  for failure do not change the fact that he has not stopped smoking despite repeated instructions

17  to do so, and the ALJ is permitted to consider this fact in assessing Plaintiff's credibility.

18         b.      *Lack of Prescription for a Wheelchair*

19         Plaintiff next argues that the ALJ improperly discredited his complaints based on the

20  lack of a prescription for a wheelchair.  The ALJ explained that in May 2002, Plaintiff stated

21  that he had a seizure on December 31, 2001 that caused him to have left-sided numbness and

22  that he had been in a wheelchair prescribed by physical therapy since early March.  AR 20.  The

23  ALJ continued, "[h]owever, the clinic notes do not show that a wheelchair was ever prescribed

24  by a physician or a physical therapist."  Instead, the only assistive device prescribed was a

25  walker.  AR 20.

26         Plaintiff correctly points to a notation in the record by physical therapist Daniel Snider,

27  on February 22, 2002, that Plaintiff was not safe to ambulate by himself and that he would order

28  a wheelchair.  AR 325.  While the ALJ was technically correct that there is not evidence of an

1    actual prescription, he should not have been so rigid so as to require a prescription in light of

2    Mr. Snider's notation.  In any event, the ALJ's credibility analysis was supported by many

3    proper considerations and the Court will not disturb the ALJ's findings based on this one

4    questionable statement.  *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding

5    ALJ's credibility determination even though one reason may have been in error).

6           c.      *"Sit and Squirm" Jurisprudence*

7           The ALJ explained that during the hearing, Plaintiff "had no difficulty responding to the

8    questions posed to him during the hearing and his responses were appropriate and topic related."

9    AR 20-21.  Plaintiff contends that this consideration was improper.

10          The ALJ made this statement in the context of supporting his decision to discredit Dr.

11   Portnoff's finding that Plaintiff had mild to moderate restrictions in daily living and in

12   maintaining social functioning.  AR 20.  He found these limitations too restrictive, based on the

13   lack of evidence that Plaintiff had difficulty interacting with any medical providers and

14   Plaintiff's demeanor at the hearing.  It was therefore not, as Plaintiff suggests, used to evaluate

15   his credibility.

16          Even if the statement could be construed to be part of the ALJ's credibility analysis, it

17   would be a proper consideration.  *See eg. Quang Van Han v. Bowen*, 882 F.2d 1453, 1458, n. 8

18   (9th Cir. 1989).  While a denial of benefits can not be based on the ALJ's observations where a

19   claimant's complaints are supported by objective evidence, such is not the case here.  *Perminter*

20   *v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985).  As the ALJ explained, Plaintiff's severe

21   allegations were not supported by the objective medical evidence.

22          d.      *Condition of Plaintiff's Sandals*

23          In questioning whether Plaintiff needed an assistive device to walk, the ALJ explained

24   that on May 10, 2002, Dr. Tan noted that Plaintiff's sandals were dirty.  AR 19, 291.  The ALJ

25   also recognized that Dr. Tan made a similar remark in June 2002, noting that Plaintiff's sandals

26   were "well worn."  AR 19, 408.  The ALJ used these observances to demonstrate the

27   inconsistencies between the evidence and Plaintiff's allegations.

28

1    Plaintiff contends that it was possible that Plaintiff's sandals were dirtied as he

2    transferred to or from his wheelchair and that they were well-worn because they were old.

3    Again, however, the ALJ is entitled to make logical inferences from the record.  *See Sample v.*

4    *Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  A treating doctor observed the conditions of

5    Plaintiff's sandals and, when taken in conjunction with the other evidence of Plaintiff's

6    questionable credibility, this was a proper consideration.

7    C.    Treating Physician's Opinion

8    _____Plaintiff argues that the ALJ erred by failing to give any weight to the opinions of

9    treating physician Dr. Naqvi.

10    The medical opinion of a claimant's treating physician is entitled to "special weight."

11    *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988); *Valencia v. Heckler*, 751 F.2d 1082, 1088

12    (9th Cir. 1985).  Reliance on the opinion of the treating physician is based not only on the fact

13    that he is employed to cure but also on his greater opportunity to observe and know the patient

14    as an individual.  However, a treating physician's opinion is not conclusive as to a physical

15    condition or the ultimate issue of disability. *Magallanes*, 881 F.2d at 751, and *Matney v.*

16    *Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  An ALJ may reject a contradicted treating

17    physician's opinion on the basis of clear findings that set out specific, legitimate, reasons for the

18    rejection. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

19    Here, the ALJ rejected Dr. Naqvi's opinion that Plaintiff could not perform any type of

20    work.  AR 21.  The ALJ explained that Dr. Naqvi did not support his opinion with any

21    objective findings, had not seen Plaintiff for one year, and his last progress note of April 2,

22    2002, did not indicate or suggest that Plaintiff is physically limited.  AR 21.

23    Plaintiff first asserts that the ALJ erred in stating that Plaintiff had not seen Dr. Naqvi

24    for one year.  As Respondent concedes, the ALJ was mistaken as Dr. Naqvi treated Plaintiff

25    approximately five times between April 2, 2002, and the date of the opinion.  AR 354, 375,

26    382, 385, 398.

27    However, this doesn't change the unsupported nature of his opinion.  Dr. Naqvi's

28    opinion was set forth on a pre-printed, check-the-box form and was not supported by any

17

1   explanation.  AR 409.  Dr. Naqvi simply listed Plaintiff's diagnoses as "seizure disorder,

2   pulmonary fibrosis" and indicated that he was unable to work in his usual occupation and was

3   permanently incapacitated from any type of work.  AR 409.  As the ALJ noted, a statement by a

4   physician indicating a claimant is "disabled" does not mean that the Secretary will concur,

5   absent review of medical findings and other evidence. 20 C.F.R. 416.927(e); *Nyman v. Heckler*,

6   779 F.2d 528 (9th Cir. 1985) ("Conclusory opinions by medical experts regarding the ultimate

7   question of disability are not binding on the ALJ.").  Moreover, a brief and conclusionary form

8   opinion which lacks supporting clinical findings is a legitimate reason to reject a treating

9   physician's conclusion.  *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

10  D.      Other Medical Opinions

11  _____Plaintiff contends that the ALJ gave inadequate reasons for rejecting the opinions of

12  consultive examiner Dr. Portnoff and the State Agency physicians that Plaintiff was mild to

13  moderately limited in maintaining social functioning. Plaintiff also argues that the ALJ

14  provided inadequate reasons for discrediting State Agency physician Sadda Reddy's assessment

15  limiting Plaintiff to simple, repetitive tasks.

16          Like the contradicted opinion of a treating physician, the contradicted opinion of an

17  examining physician can only be rejected for specific and legitimate reasons that are supported

18  by substantial evidence in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

19          In discrediting Dr. Portnoff's restriction, the ALJ explained that it appeared to be too

20  restrictive and based on Plaintiff's discredited subjective complaints.  AR 20.  *See eg., Fair v.

21  Bowen*, 885 F.2d 597, 605 (9th 1989) (ALJ may also reject the treating physician's opinion

22  because it was based on the claimant's discredited subjective complaints).  He noted that the

23  treating notes did not indicate that Plaintiff had difficulty interacting with any medical

24  providers and that Plaintiff was able to interact appropriately at the hearing.  AR 20-21.  The

25  ALJ further described Plaintiff's  inconsistent reports of work and education given to Dr.

26  Portnoff and suggested that perhaps Plaintiff was not open and forthright with his responses to

27  the doctor, which made the results of the evaluation questionable.  AR 21.  He also explained

28  that Dr. Portnoff saw Plaintiff only once, with no follow-up.

1   The ALJ was entitled to conclude that Plaintiff did not have difficulty interacting with

2   providers.  Although some of the treatment notes from the VA indicated that Plaintiff had

3   difficulties with his speech, many of the notations referenced Plaintiff's stuttering, and others

4   noted the "inconsistencies" in Plaintiff's speech presentation.  AR 291, 299, 312, 337, 351, 379,

5   406, 408.  The courts do not have the responsibility for weighing the evidence and resolving

6   conflicts therein, that responsibility belongs to the Commissioner alone.  *Richardson v.*

7   *Perales*, 402 U.S. 389, 399 (1971).  In any event, the Court must uphold the ALJ's decision

8   were the evidence is susceptible to more than one rational interpretation.  *Magallanes v. Bowen*,

9   881 F.2d 747, 750 (9th Cir. 1989).

10   Insofar as Plaintiff points to similar restrictions by State Agency physicians Dr. Ikawa

11   and Dr. Murillo, these consultants did not interact with Plaintiff and their opinions were likely

12   based on Dr. Portnoff's social interaction restriction, which the ALJ was entitled to reject.

13   Plaintiff contends that his inconsistent statements to Dr. Portnoff were a result of his

14   mental impairment and should be considered "evidence" of his impairment in support of Dr.

15   Portnoff's social interaction restriction.  Again, however, the ALJ is entitled to weigh the

16   medical evidence and, where the evidence is susceptible to more than one rational

17   interpretation, the ALJ's decision should be upheld.  *Magallanes v. Bowen*, 881 F.2d 747, 750

18   (9th Cir. 1989).

19   Although Plaintiff may not agree with the ALJ's decision, it does not render his decision

20   improper.  The ALJ gave specific and legitimate reasons for rejecting Dr. Portnoff's restriction

21   in social interaction.

22   Plaintiff next argues that the ALJ provided inadequate reasons for discrediting the

23   finding by State Agency physician Sadda Reddy, M.D., that Plaintiff was limited to simple,

24   repetitive tasks.

25   The ALJ explained that the evidence did not support a limitation to simple, repetitive

26   tasks, especially in view of Plaintiff's skilled past relevant work experience.  AR 21.  In light of

27   the ALJ's finding that Plaintiff could perform unskilled, light work, such a finding was not

28   necessary.  Unskilled work requires the ability to "understand, carry out, and remember simple

1   instructions. . . " SSR 85-15.  Here, the State Agency physicians and Dr. Portnoff found that

2   Plaintiff was capable of simple, repetitive tasks.  AR 178, 190, 200, 279.

3   E.      Residual Functional Capacity

4           Next, Plaintiff contends that the ALJ overlooked the following in making his RFC

5   determination: (1) the side effects of his medications; (2) his left thumb ankylosis and loss of a

6   finger; (3) Plaintiff's use of a medically prescribed walker; and (4) Plaintiff's shortness of

7   breath.

8           RFC is an assessment of an individual's ability to do sustained work-related physical

9   and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5

10  days a week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment must be based on

11  all of the relevant evidence in the record, including the effects of symptoms that are reasonably

12  attributed to a medically determinable impairment.  SSR 96-8p.  In addition, the adjudicator

13  "must consider limitations and restrictions imposed by all of an individual's impairments, even

14  those that are not 'severe,'" because such limitations may be outcome determinative when

15  considered in conjunction with limitations or restrictions resulting from other impairments.

16  SSR 96-8p.

17          a.      *Side Effects of Medication*

18          Plaintiff contends that while the ALJ noted Plaintiff's testimony that he experiences

19  drowsiness as a side effect of his medication, the ALJ failed to account for this and other side

20  effects in his RFC finding.  Plaintiff points to his reports of lightheadedness, fatigue, loss of

21  memory, dry mouth and dizziness.  AR 80, 107-108.  He also points to the report of his care

22  giver, Cynthia Salazar, that he experiences grogginess as a result of his medications and naps

23  during the day.  AR 134.  Plaintiff also points to VA treatment notes dated February 1, 2002

24  and May 7, 2002, that indicate Plaintiff was experiencing excessive drowsiness from Dilantin.

25  AR 294-296, 319.  Plaintiff then cites side effect information for Plaintiff's medication from an

26  internet website.

27          Plaintiff correctly states that medication side effects should be taken into consideration

28  when determining a claimant's RFC.  *Varney v. Secretary of Health & Human Serv.,* 846 F.2d

20

1   581, 585 (9th Cir. 1988) (side effects of prescribed medication may have a significant effect on

2   an individual's ability to work, and therefore should be considered in making a disability

3   determination).  However, alleged side effects need not be considered where no objective

4   evidence supports the allegations.  *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002).

5       Here, a majority of the side effect evidence came from Plaintiff himself, whose

6   testimony the ALJ properly discredited, as explained above.  Moreover, insofar as the treatment

7   notes indicate that Plaintiff's Dilantin caused excessive drowsiness, the dose was decreased and

8   he was switched to Phenobarbital in August 2002.  AR 395.  Indeed, in February 2003, Dr.

9   Naqvi reported that Plaintiff was compliant with his medications, that his seizure problem was

10  well controlled with Phenobarbital, and that there were no reported side-effects.  AR 375.

11  Although a May 2003 treatment note indicated that Phenobarbital would be changed if

12  Plaintiff's blood pressure continued to be low, there is no indication that a change was made.

13  AR 354.

14          b.      *Left Thumb Ankylosis and Loss of Finger*

15      Plaintiff contends that the ALJ erred by failing to include a limitation for impaired

16  gripping and fingering based on Plaintiff's left thumb terminal joint ankylosis and loss of a

17  finger.

18      In February 2001, Plaintiff saw Dr. Mullady for a consultive examination.  Although

19  Plaintiff indicated that he had an injury to the left thumb in 1980 and subsequent surgery, he did

20  not mention that he was missing a finger.  AR 157.  Nor did Dr. Mullady, or any other

21  physician, indicate that Plaintiff had lost a finger.  Upon examination, Plaintiff had decreased

22  grip strength and a mild impairment of dexterity in the left hand, but Dr. Mullady did not

23  impose any manipulative limitations.  AR 159.  An ALJ may give greater weight to an

24  examiner's opinion than a nonexamining State Agency physician's opinion.  *Pitzer v. Sullivan*,

25  908 F.2d 502, 506 (9th Cir. 1990).

26  ///

27  ///

28  ///

21

1      c.      *Use of Walker*

2      Plaintiff contends that the ALJ's finding that Plaintiff could stand and/or walk for six

3  hours in a workday fails to reflect the mobility restrictions resulting from Plaintiff's dependence

4  on a medically prescribed walker.

5      Indeed, the record reflects that Plaintiff was prescribed and used a walker because of

6  alleged left-sided weakness caused by several strokes.  AR 328.  When first assessed by physical

7  therapist Daniel Snider on February 22, 2002, Mr. Snider indicated that Plaintiff was not safe to

8  ambulate with the walker by himself.  AR 325.  This was based in part on Plaintiff's report of

9  numerous falls since January 2002.  AR 324-325.  However, on February 27, 2002, Mr. Snider

10  questioned whether Plaintiff even suffered a stroke, as his "clinical manifestations are not

11  consistent" with a stroke.  AR 314.  Mr. Snider gave a thorough and detailed analysis of why

12  Plaintiff's clinical presentation did not equate with a stroke.  AR 314.

13      Moreover, the objective medical evidence does not support a finding that Plaintiff

14  suffered a stroke(s).   Plaintiff reported two strokes in January 2000 and November 2000, but

15  when examined by Dr. Mullady in February 2001, his gait and muscle strength in all

16  extremities was normal.   AR 158, 245.  CT scans of Plaintiff's head in February and March

17  2002, were normal.  AR 310, 318.  A May 2002 examination revealed no evidence of

18  hyperreflexia or atrophy to support a stroke.  AR 292.  There was no atrophy of the lower

19  extremities.  AR 291.  Plaintiff's sandals were described as dirty and well-worn.  AR 291.  An

20  EEG performed in May 2002 was normal.  AR 297.  In February 2003, Plaintiff underwent a

21  sleep-deprived EEG study.  Although the test was not optimal, the results were normal.  AR

22  360.  Another CT scan of the head in May 2003 was normal.  AR 346.

23      Accordingly, given the lack of objective evidence regarding Plaintiff's alleged strokes,

24  the ALJ reasonably determined that Plaintiff's standing and walking abilities were greater than

25  he alleged.  In assessing a claimant's RFC, the ALJ may rely upon the State Agency physicians'

26  findings as to claimant's ability.  20 C.F.R. §§ 404.1513(c), 404.1527(f)(2)(I).

27  ///

28  ///

22

1         d.     *Shortness of Breath*

2         Plaintiff also faults the ALJ for not including Plaintiff's shortness of breath in his RFC

3 finding. He contends that Dr. Mullady found that Plaintiff had moderate obstructive airway

4 disease. Plaintiff does not, however, point to any resulting limitations. While Dr. Mullady

5 diagnosed chronic obstructive pulmonary disease, he opined that Plaintiff could perform light to

6 moderate physical activity not involving heavy or repetitive bending. AR 159. The ALJ's

7 restriction to light work therefore reflects Dr. Mullady's limitations.

8 F.     <u>Lay Witness Reports</u>

9       Plaintiff's care giver, Cynthia Salazar, and Plaintiff's sister, Sandra Nicol-Monroy,

10 submitted written statements in support of Plaintiff's SSI application. AR 128, 134. Plaintiff

11 argues that the ALJ erred by failing to either expressly discredit these statements or include the

12 limitations included therein into the RFC.

13         Lay witness testimony as to a claimant's symptoms is competent evidence which the

14 Commissioner must take into account. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

15 The ALJ may reject such testimony if he does so expressly, in which case "he must give reasons

16 that are germane to each witness." *Id.* However, the ALJ need not discuss lay witness

17 testimony that pertains to whether or not an impairment exists. *Nguyen v. Chater,* 100 F.3d

18 1462, 1467 (9th Cir. 1996). These medical diagnoses are beyond the competence of lay

19 witnesses and therefore do not constitute competent evidence. 20 C.F.R. § 404.1513(a).

20 However, once an impairment has been established by medical evidence, the extent of the

21 diagnosed impairment may be testified to by the lay witnesses. 20 C.F.R. § 404.1513(e),

22 *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).

23         Ms. Nicol-Monroy explained why Plaintiff lived with her, indicated that he could not

24 care for himself, and that he was unemployable and did not have the mental or physical

25 capabilities to hold a job. AR 128. Plaintiff's ability to work is a determination reserved for

26 the Commissioner, and Ms. Nicol-Monroy's letter offers no other relevant evidence as to

27 Plaintiff's condition.

28

1    Similarly, Ms. Salazar's letter provided little relevant evidence.[4]  She detailed Plaintiff's

2  history and explained that his medications make him groggy, that he naps during the day,

3  experiences difficulty comprehending and has speech, memory and coordination problems.  AR

4  130-133.  Although Ms. Salazar's letter provided evidence of Plaintiff's symptoms, she did not

5  provide any information beyond the discredited information provided by Plaintiff.  Even if the

6  ALJ erred in not specifically discrediting Ms. Salazar's statements, the error was harmless,

7  especially given Plaintiff's questionable credibility and the lack of objective medical evidence.

8  *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding an error harmless

9  where it did not negate the validity of the ALJ's ultimate conclusion).

10  G.    VE Testimony

11    Finally, Plaintiff argues that the ALJ improperly relied on the testimony of the VE for

12  three reasons: (1) the ALJ failed to include all accepted limitations in the hypotheticals; (2) the

13  ALJ erred by concluding that a significant number of jobs existed; and (3) the ALJ failed to

14  elicit testimony from the VE regarding erosion of the occupational base.

15    a.    *Hypothetical Question*

16    "Hypothetical questions posed to the vocational expert must set out all the limitations

17  and restrictions of the particular claimant . . . ."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th

18  Cir.1988).  The testimony of a VE "is valuable only to the extent that it is supported by medical

19  evidence."  *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982).  The VE's opinion about a

20  claimant's residual functional capacity has no evidentiary value if the assumptions in the

21  hypothetical are not supported by the record.  *Embrey*, 849 F.2d at 422.

22    Plaintiff first argues that the ALJ's RFC finding included a requirement to avoid moving

23  machinery, but that the hypotheticals included the requirement to avoid only dangerous moving

24  machinery.  AR 16, 428-429.  If the ALJ included the restriction from all moving machinery,

25  Plaintiff contends that the sewing machine operator job would have been eliminated.

26    It appears that the ALJ mistakenly omitted the word "dangerous" from the RFC finding

27  in his decision.  Indeed, the record does not support a restriction from *all* machinery.  In any

28

---

[4] Portions of the statement are difficult to read.

24

1    event, if the sewing machine operator position was eliminated, Plaintiff would still be able to

2    perform the positions of cashier (15,600 in California and 141,700 nationally) and ticket seller

3    (11,700 in California and 106,300 nationally. AR 428.  Any error was harmless, at best.  *Batson*

4    *v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004).

5           Plaintiff also argues that the hypothetical should have included a limitation based on the

6    loss of Plaintiff's finger.  However, as explained above, there was no indication in the record

7    that the alleged loss of Plaintiff's finger resulted in any limitations.

8           b.      *Significant Number of Jobs*

9           Plaintiff contends that the ALJ erred by determining that the sewing machine operator

10   position (800 in California and 6,900 nationally) constituted a significant number of positions.

11   AR 428.

12          Plaintiff's argument misunderstands how the number of jobs is calculated.  First,

13   however, the Ninth Circuit has never found a minimum number of jobs necessary to constitute a

14   significant number within the meaning of the Act.  *Barker v. Secretary of Health & Human*

15   *Servs.*, 882 F.2d 1474, 1478 (9th Cir. 1989) (finding that 1266 jobs in the Los Angeles/Orange

16   County are were considered significant); *see also Moncada v. Chater*, 60 F.3d 521, 524 (9th

17   Cir. 1995); *Martinez v. Heckler,* 807 F.2d 771, 775 (9th Cir. 1986).  In any event, the relevant

18   number is the *total* number of positions available.  In other words, here the total number of

19   local jobs available, considering the positions of cashier, ticket seller and sewing machine

20   operator, is 28,100 (254,900 nationally).  This constitutes a significant number of positions.

21          c.      *Erosion of the Occupational Base*

22          Finally, Plaintiff contends that the ALJ erred by failing to elicit testimony from the VE

23   regarding the erosion of the occupational base.  He argues, without explanation, that not all of

24   the positions cited by the VE would entirely accommodate Plaintiff's limitations.

25          Plaintiff's argument fails.  As explained throughout this decision, the ALJ's RFC and

26   accepted hypothetical included all of the limitations supported by the record.  The VE was

27   therefore presented with all of Plaintiff's limitations when he responded to the hypothetical

28   questions and there was no issue regarding erosion of the occupational base.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff, Stanley L. McDaniel.

IT IS SO ORDERED.

**Dated:    September 15, 2005**             **/s/ Dennis L. Beck**

3b142a                           UNITED STATES MAGISTRATE JUDGE